William C. Rand, Esq. (WR-7685)
LAW OFFICE OF WILLIAM COUDERT RAND
501 Fifth Ave., 15th Floor
New York, New York 10017
Phone: (212) 286-1425; Fax: (646) 688-3078
Email: wcrand@wcrand.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X

GALYNA ZINKO, BOGAAN ZINKO, and : 
LUBOV KONIK, :     ECF
Individually and on Behalf of All Other :     21 Civ. 3607
Persons Similarly Situated, :
 :
                Plaintiffs, :
 :     **COMPLAINT AND**
   -against- :     **JURY DEMAND**
 :
PARAMOUNT HOME CARE AGENCY INC., :
ROMAN OFFENGEYM, MARINA OFFENGEYM and :
JOHN DOES #1-10, :
 :
                Defendants. :

-----------------------------------------------------------------------X

      Plaintiffs  GALYNA ZINKO, BOGAAN ZINKO, and LUBOV KONIK  (together "Plaintiff" or "Plaintiffs"), on behalf of themselves individually and as class representatives of other employees similarly situated, by and through their attorney, complain and allege for their complaint against PARAMOUNT HOME CARE AGENCY INC., ROMAN OFFENGEYM, MARINA OFFENGEYM and JOHN DOES #1-10 (together "Defendant" or "Defendants") as follows:

## NATURE OF THE ACTION

      1.      Plaintiffs were home health aides who worked for Defendants for more than 40 hours per week ("overtime hours") and, along with numerous other similar home health aides, was paid straight time for her overtime hours and was not paid time and one half for her overtime hours and was illegally not paid for many 24 hour shifts or illegally paid for only 13 hours of her

24 hour shifts and also was not paid minimum wages under the New York Labor Law and the N.Y. Health Care Worker Wage Parity Act.

2.     Plaintiffs allege on behalf of themselves and other similarly situated current and former employees of the Defendants who elect to opt into this action pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 216(b), that they are: (i) entitled to unpaid wages from Defendants for overtime work for which they did not receive overtime premium pay, as required by law, and (ii) entitled to liquidated damages pursuant to the FLSA, 29 U.S.C. §§201 *et seq.*

3.     Plaintiffs further complain on behalf of themselves, and a class of other similarly situated current and former employees of the Defendant, pursuant to Fed. R. Civ. P. 23, that they are entitled to back wages from Defendant for (a) hours worked for which they did not receive wages including wages as required under the Wage Parity Act, (b) overtime work performed for which they received straight pay and did not receive time and one half the minimum wage or time and one half their actual wages, and (c) spread of hours work performed for which they did not receive an extra hour of pay, as required by the New York Labor Law §§ 650 *et seq.* and the supporting New York State Department of Labor regulations and are also entitled to damages under the New York Wage Theft Prevention Act because Defendants did not provide proper notices to Plaintiff

## **JURISDICTION AND VENUE**

4.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1337, 1343, and supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.  In addition, the Court has jurisdiction over Plaintiff's claims under the FLSA pursuant to 29 U.S.C. § 216(b).

5.     Venue is proper in this District pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District.

6.     This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

## THE PARTIES

6.     Plaintiffs were, at all relevant times, adult individuals, residing in Kings County in New York State.

7.     Upon information and belief, Defendant PARAMOUNT HOME CARE AGENCY INC., (the "Corporate Defendant") is a New York corporation, with its principal place of business at 161 Kings Highway, Suite 2, Brooklyn, N.Y. 11223.

8.     Upon information and belief, Defendants ROMAN OFFENGEYM and MARINA OFFENGEYM  are owners of the Corporate Defendants and are each an officer, director and/or managing agent of the Corporate Defendant, whose address is unknown at this time and who participated in the day-to-day operations of the Corporate Defendant and acted intentionally and maliciously and is an "employer" pursuant to the FLSA, 29 U.S.C. §203(d) and regulations promulgated thereunder, 29 C.F.R. §791.2, as well as the New York Labor Law Sec. 2 and the regulations thereunder and is jointly and severally liable with the Corporate Defendant.

9.     Upon information and belief, Defendants ROMAN OFFENGEYM and MARINA OFFENGEYM  and John Does #1-10 ("Individual Defendants") represent the officers, directors and/or managing agents of the Corporate Defendant, whose identities are unknown at this time and who participated in the day-to-day operations of the Corporate Defendant and acted intentionally and maliciously and are "employers" pursuant to the FLSA, 29 U.S.C. §203(d) and

regulations promulgated thereunder, 29 C.F.R. §791.2, as well as the New York Labor Law Sec.

2 and the regulations thereunder and are jointly and severally liable with the Corporate

Defendant.

10.     Upon information and belief, ROMAN OFFENGEYM is the Chief Executive

Officer of the Corporate Defendant and has held these positions during the last 6 years ("Roman

time period").

11.     During the Roman time period, MARINA OFFENGEYM is and has been an

owner and President of Paramount.

12.     MARINA OFFENGEYM is the mother of ROMAN OFFENGEYM.

13.     Upon information and belief, during the Roman time period, the Individual

Defendants had authority over the Corporate Defendant's management, supervision, and

oversight of the Corporate Defendant's affairs in general and exercised operational control over

the Corporate Defendants' home health aide employees and other employees and their decisions

directly affected the nature and condition of the home health care employees' employment.

14.     Upon information and belief, during the Roman time period, Each Individual

Defendant  (1) had the power to hire and fire the home health aide employees of the Corporate

Defendant, (2) supervised and controlled the home health aide employees' schedules and

conditions of employment, (3) determined the rate and method of payment of the home health

aide employees, and (4) maintained employment records related to the home health aide

employees.

**COLLECTIVE ACTION ALLEGATIONS**

15.     Pursuant to 29 U.S.C. §207, Plaintiffs seek to prosecute her FLSA claims as a

collective action on behalf of all persons who are or were formerly employed by Defendant at

any time since June 26, 2015 (time tolled by failure to post notice) to the entry of judgment in

this case (the "Collective Action Period"), who were non-exempt employees within the meaning

of the FLSA and who were not paid minimum wages and/or overtime compensation at rates not

less than one and one-half times the regular rate of pay for hours worked in excess of forty hours

per workweek (the "Collective Action Members").

16.     Defendants failed to post a notice in a conspicuous location indicating that

Plaintiffs and similar home health aid employees were entitled to minimum wages and to

overtime and one and one half times their regular hourly rate.

17.     This collective action class is so numerous that joinder of all members is

impracticable. Although the precise number of such persons is unknown, and the facts on which

the calculation of that number are presently within the sole control of the Defendant, upon

information and belief, there are at least 40 members of the Class during the Collective Action

Period, most of whom would not be likely to file individual suits because they lack adequate

financial resources, access to attorneys or knowledge of their claims.

18.     Plaintiffs will fairly and adequately protect the interests of the Collective Action

Members and has retained counsel that is experienced and competent in the fields of employment

law and class action litigation.  Plaintiffs have no interests that are contrary to or in conflict with

those members of this collective action.

19.     A collective action is superior to other available methods for the fair and efficient

adjudication of this controversy, since joinder of all members is impracticable. Furthermore,

inasmuch as the damages suffered by individual Collective Action Members may be relatively

small, the expense and burden of individual litigation make it virtually impossible for the members of the collective action to individually seek redress for the wrongs done to them. There will be no difficulty in the management of this action as a collective action.

20.     Questions of law and fact common to the members of the collective action predominate over questions that may affect only individual members because Defendant has acted on grounds generally applicable to all members. Among the common questions of law and fact common to Plaintiffs and other Collective Action Members are

  a. whether the Defendant employed the Collective Action members within the meaning of the FLSA;

  b. whether the Defendant failed to keep true and accurate time records for all hours worked by Plaintiffs and the Collective Action Members;

  c. what proof of hours worked is sufficient where the employer fails in its duty to maintain time records;

  d. whether Defendant failed to post or keep posted a notice explaining the minimum wages and overtime pay rights provided by the FLSA in any area where Plaintiffs are employed, in violation of C.F.R. § 516.4;

  e. whether Defendant failed to pay the Collective Action Members minimum wages and overtime compensation for hours worked in excess of forty hours per workweek, in violation of the FLSA and the regulations promulgated thereunder;

  f. whether Defendant's violations of the FLSA are willful as that term is used within the context of the FLSA;

    g.   whether Defendant is liable for all damages claimed hereunder, including but not limited to compensatory, punitive and statutory damages, interest, costs and disbursements and attorneys' fees; and

    h.   whether Defendant should be enjoined from such violations of the FLSA in the future.

21.    Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a collective action.

<u>**CLASS ALLEGATIONS**</u>

22.    Plaintiffs sue on their own behalf and for their class claims on behalf of a class of persons under Rules 23(a), (b)(1), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure.

23.    Plaintiffs brings their New York State Law claims on behalf of all persons who were employed by Defendant at any time since June 26, 2015, to the entry of judgment in this case (the "Class Period"), who were not paid all their straight time wages, minimum wages (including those required by the NY Health Care Worker Wage Parity Act), spread of hour wages, and/or overtime wages and/or were not provided the notices required by the Wage Theft Prevention Act (the "Class" or "Class Members").

24.    The persons in the Class identified above are so numerous that joinder of all members is impracticable. Although the precise number of such persons is unknown, and the facts on which the calculation of that number are presently within the sole control of the Defendant, upon information and belief, there at least 40 members of Class during the Class Period.

25.    The claims of Plaintiffs are typical of the claims of the Class, and a class action is

superior to other available methods for the fair and efficient adjudication of the controversy—particularly in the context of wage and hour litigation where individual plaintiffs lack the financial resources to vigorously prosecute a lawsuit in federal court against corporate defendants.

26.     The Defendant has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

27.     Plaintiffs are committed to pursuing her action and has retained competent counsel experienced in employment law and class action litigation.

28.     Plaintiffs have the same interests in this matter as all other members of the class and Plaintiff's claims are typical of the Class.

29.     There are questions of law and fact common to the Class which predominate over any questions solely affecting the individual members of the Class, including but not limited to:

a.  whether the Defendant employed the members of the Class within the meaning of the New York Labor Law;

b.  whether the Defendant failed to keep true and accurate time records for all hours worked by Plaintiffs and members of the Class;

c.  what proof of hours worked is sufficient where employers fail in their duty to maintain time records;

d.  whether Defendant failed and/or refused to pay the members of the Class for all hours worked by them as well as premium pay for hours worked in excess of forty hours per

workweek as well as spread of hours pay for hours worked a spread of more than ten

hours, within the meaning of the New York Labor Law;

e.  whether the Defendant is liable for all damages claimed hereunder, including but not

limited to compensatory, interest, costs and disbursements and attorneys' fees;

f.  whether the Defendant should be enjoined from such violations of the New York

Labor Law in the future; and

## STATEMENT OF FACTS

### GALYNA ZINKO

30.     GALYNA ZINKO ("GALYNA") was a home health aide/maid employed by

Paramount Home Care Agency Inc. ("Paramount"), and Roman Offengeym, Owner and  CEO,

and his mother Marina Offengeym (collectively "Defendants" or the "Company"), from about

February 13, 2019 to September 25, 2020 (the "time period").

31.     During the time period GALYNA worked for one client who had dementia and

eventually died of throat cancer.

32.     Defendants are an employment agency that sent GALYNA to work as a home

health aide/maid for numerous customers located in New York City.

33.     During the time period, Roman Offengeym and Marina Offengeym each

participated in the day-to-day operations of Paramount.

34.     During the time period, Offengeym and Marina Offengeym each had authority

over the management, supervision, and oversight of the Paramount's affairs in general and

exercised operational control over Paramount's home health aide employees and other

employees and his decisions directly affected the nature and condition of the home health care

employees' employment.

35.    During the time period,  Offengeym and Marina Offengeym each had the power

to hire and terminate me and the other home health aide employees of the Company ("home

health aides") and did hire and terminate health aide employees, (2) supervised and controlled

me and the other home health aides' schedules and conditions of employment, (3) determined the

rate and method of payment of myself and the other home health aides, and (4) maintained

employment records related to myself and the other home health aide employees.

36.    During the time period, GALYNA never worked for Defendants outside of New

York City.

37.    During the time period, GALYNA maintained her own residence, and did not

legally reside in the homes of Defendants' clients or in the home of her employer, as her primary

residence.

38.    During the time period, GALYNA was not an "exempt companion" of the

Defendants' clients.

39.    While employed by Defendants, GALYNA generally worked more than 40 hours

per week and was not paid time and one half for my hours worked over 40 in a work week.

40.    GALYNA worked 24-hour shifts for Defendants during my employment and

regularly worked 2 24-hour shifts in a week.

41.    Defendants had no policies in place to determine if a health aide received three

one hour meal breaks during a 24-hour live in shift and did not have any policies to determine if

any health aide received 5 hours of uninterrupted sleep and 8 hours of sleep during a 24-hour live

in shift.

42.     Even when Defendants had knowledge that a health aide was unable to get any sleep during the night or take any meal breaks, Defendants still illegally deducted 8 hours of sleep time and three hours of meal break time from the health aide's hours worked.

43.     Defendants had no policies in place to identify which health aides were not getting sleep or breaks during 24-hour live in shifts and to pay them for their lack of sleep or meal breaks.

44.     Defendants had no policy to identify which aides were not provided a bed to sleep on during 24-hour live in shifts.

45.     Even when Defendants knew an aide was not given a bed to sleep on during 24-hour live in shifts, Defendants did not pay the health aide for 8 hours of the aide's 24 hour shift.

46.     When GALYNA worked 24-hour shifts,  GALYNA was required to stay overnight at the residences of Defendants' clients, and needed to be ready and available to provide assistance to Defendants' clients as needed.

47.     When GALYNA worked 24-hour shifts, GALYNA was not permitted to leave the client unattended.

48.     GALYNA was only paid for approximately 13 hours of er 24-hours shifts. GALYNA  was not paid any hourly rate for the other 11 hours worked.

49.     GALYNA was generally not permitted to leave the client's residence during her shift.

50.     Because Defendants' clients were often elderly and/or suffering from dementia, GALYNA did not get an opportunity to sleep for eight hours or 5 hours without any interruption.

51.     GALYNA did not get a one-hour break for each of three meals per day.

52.     GALYNA was often forced to combine her meal times with the meal times of the Defendants' clients because they needed feeding assistance or constant supervision.

53.     GALYNA did not receive the "spread of hours" premium of one additional hour at the minimum wage rate for the days in which GALYNA worked a spread of more than ten hours.

54.     GALYNA also did not receive minimum wages, including minimum wages under the Wage Parity Act, for all her hours worked and was not paid time and one half the minimum wage rate for her overtime hours and was not paid full time and one half her regular rate for her overtime hours.

55.     Defendants never provided or offered to GALYNA any health insurance, free of charge, and never paid GALYNA for any vacation or holiday time off.

56.     Medicaid paid Defendants for some or all of GALYNA's services and the services of the other similar home health aide employees.

57.     GALYNA's co-workers performed the same and/or similar work to that of herself and were paid in a similar manner and subject to the same rules and policies ("similar health aides").

58.     The similar health aides did not "live in" the homes of Defendants' clients as their primary residences.

59.     The similar health aides generally worked more than 40 hours per week, but were not paid for every hour that they worked.

60.     The similar health aides were only paid for approximately 13 hours of their 24-hours shifts, and were not paid any hourly rate for the other 11 hours worked.

61.     The similar health aides were generally not permitted to leave the client's residence during their shift.

62.     When the similar health aides worked 24-hour shifts, they were required to stay overnight at the residences of Defendants' clients, and were required to be ready and available to provide assistance to Defendants' clients as needed.

63.     At all relevant times, Defendants have maintained a practice and policy of paying similar health aides for only 13 hours of their 24-hour shifts in violation of New York Labor Law.

64.     Defendants had no policies in place to determine if a health aide received three one hour meal breaks during a 24-hour live in shift and did not have any policies to determine if any health aide received 5 hours of uninterrupted sleep and 8 hours of sleep during a 24-hour live in shift.

65.     When GALYNA told the supervisor that GALYNA was unable to get any sleep during the night or any meal breaks, Defendants still deducted 8 hours of sleep time and three hours of meal breaks from my hours worked.

66.     Defendants had no policies in place to identify which health aides were not getting sleep or breaks during 24-hour live in shifts and to pay them for their lack of sleep or meal breaks.

67.     At all relevant times, Defendants have maintained a practice and policy of assigning myself and similar health aides to work more than 40 hours per week without paying us one and one half times the basic minimum hourly rate for all hours worked in excess of forty per week, in violation of New York State Labor Law and the Wage Parity Act.

68.     GALYNA and the similar health aides did not receive the "spread of hours" premium of one additional hour at the minimum wage rate for the days in which they worked a spread of more than ten hours.

69.     Defendants' actions as described herein were intentional and not made in good faith.

70.     When GALYNA  first started to work 24-hour shifts, GALYNA complained to her coordinator and to payroll, that GALYNA was not able to sleep during the night or get meal breaks but was not being paid for 8 hours of alleged sleep and 3 hours of meal breaks.  They responded that the Company does not pay more than 13 hours for a 24-hour shift.

71.     GALYNA was not able to get 5 hours of uninterrupted sleep or 8 hours of sleep during 24 hour live in shifts because GALYNA generally had to get up at least every four hours to attend to the client, which included among other services, to provide food to the client, to take the client to the bathroom, to get the client a glass of water, to calm the client when the client awoke in stress, to clean the client's bed when the client urinated or defecated in the bed and/or to change the client's pajamas.

72.     The client lived in a room studio apartment, and therefore GALYNA slept in the same room as the client which made it impossible not to be woken repeatedly by the client when sleeping and impossible not to be interrupted by the client when eating.

73.     GALYNA's client had dimentia and never continuously slept for more than 4 hours at any time.

74.     During the time period, GALYNA had to turn the client every 2 hours and therefore did not get 5 hours of uninterrupted sleep during her 24 hour shifts.  GALYNA

14

reported this turning by a code by phone at the end of each shift.

75.     During the 24 hour shifts, GALYNA  was only given a couch to sleep on which did not have  any fold out bed and was very uncomfortable and did not allow me to get any sleep.

76.     During the time period, GALYNA was not paid full regular wages for all her hours worked and was not paid overtime wages for all of her hours worked over forty in a workweek ("overtime"), and was not paid an extra hour of pay for her hours worked over a spread of 10 hours per day.

77.     During the time period, GALYNA often worked for 24 hours staying overnight at the client's house, and on these days was only paid for 13 hours, despite the fact that her sleep was regularly interrupted generally at least 3-4 times by the client throughout the night which prevented her from getting 5 hours of uninterrupted sleep and/or 8 hours of sleep and despite the fact that GALYNA was not given any time off for meal breaks.

78.     GALYNA also generally signed in and out using the client's land line phone.

79.     When GALYNA clocked out, GALYNA generally entered codes showing the types of work that GALYNA had performed.  At times GALYNA filed handwritten time sheets. There were no codes to report not getting sleep or breaks during 24-hour shifts.

80.     During the time period, GALYNA did not receive a meal break because GALYNA was on call or working during her break and regularly interrupted by the client while eating.

81.     During the time period, GALYNA was not paid for all her hours worked and was not paid for her hours worked over 40 hours a week ("overtime hours") at time and one half my

regular wages and at times was not paid for all my hours at the minimum wage rate.

82.     During the time period,  GALYNA was not specifically notified by Defendants of the regular pay day designated by Defendants, Defendants' name, address and principle place of business and telephone number and my specific rate of pay as required by the New York Wage Theft Prevention Act.  GALYNA has not been given any specific notice of this information to sign in Ukranian, her first language or in English or in any other language and has not signed any such notice.

BOGAAN ZINKO

83.     BOGAAN ZINKO ("BOGAAN") was a home health aide/maid employed by Paramount Home Care Agency Inc. ("Paramount"), and Roman Offengeym, Owner and  CEO, and his mother Marina Offengeym (collectively "Defendants" or the "Company"), from about September 28, 2019 to about October 2, 2020 (the "BOGAAN time period"). During the time period I worked for one client who had dementia and eventually died of throat cancer.

84.     During the time period BOGAAN worked for one client who had dementia and eventually died of throat cancer.

85.     Defendants are an employment agency that sent BOGAAN to work as a home health aide/maid for numerous customers located in New York City.

86.     During the BOGAAN time period, Roman Offengeym and Marina Offengeym each  participated in the day-to-day operations of Paramount.

87.     During the BOGAAN time period, Offengeym and Marina Offengeym each had authority over the management, supervision, and oversight of the Paramount's affairs in general and exercised operational control over Paramount's home health aide employees and other

employees and his decisions directly affected the nature and condition of the home health care employees' employment.

88.     During the BOGAAN time period,  Offengeym and Marina Offengeym each had the power to hire and terminate me and the other home health aide employees of the Company ("home health aides") and did hire and terminate health aide employees, (2) supervised and controlled me and the other home health aides' schedules and conditions of employment, (3) determined the rate and method of payment of myself and the other home health aides, and (4) maintained employment records related to myself and the other home health aide employees.

89.     During the BOGAAN time period, BOGAAN never worked for Defendants outside of New York City.

90.     During the BOGAAN time period, BOGAAN maintained her own residence, and did not legally reside in the homes of Defendants' clients or in the home of her employer, as her primary residence.

91.     During the BOGAAN time period, BOGAAN was not an "exempt companion" of the Defendants' clients.

92.     While employed by Defendants, BOGAAN generally worked more than 40 hours per week and was not paid time and one half for my hours worked over 40 in a work week.

93.     BOGAAN worked 24-hour shifts for Defendants during my employment and regularly worked 2 24-hour shifts in a week.

94.     Defendants had no policies in place to determine if a health aide received three one hour meal breaks during a 24-hour live in shift and did not have any policies to determine if any health aide received 5 hours of uninterrupted sleep and 8 hours of sleep during a 24-hour live

in shift.

95.    Even when Defendants had knowledge that a health aide was unable to get any sleep during the night or take any meal breaks, Defendants still illegally deducted 8 hours of sleep time and three hours of meal break time from the health aide's hours worked.

96.    Defendants had no policies in place to identify which health aides were not getting sleep or breaks during 24-hour live in shifts and to pay them for their lack of sleep or meal breaks.

97.    Defendants had no policy to identify which aides were not provided a bed to sleep on during 24-hour live in shifts.

98.    Even when Defendants knew an aide was not given a bed to sleep on during 24-hour live in shifts, Defendants did not pay the health aide for 8 hours of the aide's 24 hour shift.

99.    When BOGAAN worked 24-hour shifts,  BOGAAN was required to stay overnight at the residences of Defendants' clients, and needed to be ready and available to provide assistance to Defendants' clients as needed.

100.    When BOGAAN worked 24-hour shifts, BOGAAN was not permitted to leave the client unattended.

101.    BOGAAN was only paid for approximately 13 hours of er 24-hours shifts. BOGAAN  was not paid any hourly rate for the other 11 hours worked.

102.    BOGAAN was generally not permitted to leave the client's residence during her shift.

103.    Because Defendants' clients were often elderly and/or suffering from dementia, BOGAAN did not get an opportunity to sleep for eight hours or 5 hours without any interruption.

104.    BOGAAN did not get a one-hour break for each of three meals per day.

105.    BOGAAN was often forced to combine her meal times with the meal times of the Defendants' clients because they needed feeding assistance or constant supervision.

106.    BOGAAN did not receive the "spread of hours" premium of one additional hour at the minimum wage rate for the days in which BOGAAN worked a spread of more than ten hours.

107.    BOGAAN also did not receive minimum wages, including minimum wages under the Wage Parity Act, for all her hours worked and was not paid time and one half the minimum wage rate for her overtime hours and was not paid full time and one half her regular rate for her overtime hours.

108.    Defendants never provided or offered to BOGAAN any health insurance, free of charge, and never paid BOGAAN for any vacation or holiday time off.

109.    Medicaid paid Defendants for some or all of BOGAAN's services and the services of the other similar home health aide employees.

110.    BOGAAN's co-workers performed the same and/or similar work to that of herself and were paid in a similar manner and subject to the same rules and policies ("similar health aides").

111.    The similar health aides did not "live in" the homes of Defendants' clients as their primary residences.

112.    The similar health aides generally worked more than 40 hours per week, but were not paid for every hour that they worked.

113.    The similar health aides were only paid for approximately 13 hours of their 24-

hours shifts, and were not paid any hourly rate for the other 11 hours worked.

114.    The similar health aides were generally not permitted to leave the client's residence during their shift.

115.    When the similar health aides worked 24-hour shifts, they were required to stay overnight at the residences of Defendants' clients, and were required to be ready and available to provide assistance to Defendants' clients as needed.

116.    At all relevant times, Defendants have maintained a practice and policy of paying similar health aides for only 13 hours of their 24-hour shifts in violation of New York Labor Law.

117.    Defendants had no policies in place to determine if a health aide received three one hour meal breaks during a 24-hour live in shift and did not have any policies to determine if any health aide received 5 hours of uninterrupted sleep and 8 hours of sleep during a 24-hour live in shift.

118.    When BOGAAN told the supervisor that BOGAAN was unable to get any sleep during the night or any meal breaks, Defendants still deducted 8 hours of sleep time and three hours of meal breaks from my hours worked.

119.    Defendants had no policies in place to identify which health aides were not getting sleep or breaks during 24-hour live in shifts and to pay them for their lack of sleep or meal breaks.

120.    At all relevant times, Defendants have maintained a practice and policy of assigning myself and similar health aides to work more than 40 hours per week without paying us one and one half times the basic minimum hourly rate for all hours worked in excess of forty

per week, in violation of New York State Labor Law and the Wage Parity Act.

121.    BOGAAN and the similar health aides did not receive the "spread of hours" premium of one additional hour at the minimum wage rate for the days in which they worked a spread of more than ten hours.

122.    Defendants' actions as described herein were intentional and not made in good faith.

123.    When BOGAAN  first started to work 24-hour shifts, BOGAAN complained to her coordinator and to payroll, that BOGAAN was not able to sleep during the night or get meal breaks but was not being paid for 8 hours of alleged sleep and 3 hours of meal breaks.  They responded that the Company does not pay more than 13 hours for a 24-hour shift.

124.    BOGAAN was not able to get 5 hours of uninterrupted sleep or 8 hours of sleep during 24 hour live in shifts because BOGAAN generally had to get up at least every four hours to attend to the client, which included among other services, to provide food to the client, to take the client to the bathroom, to get the client a glass of water, to calm the client when the client awoke in stress, to clean the client's bed when the client urinated or defecated in the bed and/or to change the client's pajamas.

125.    The client lived in a room studio apartment, and therefore BOGAAN slept in the same room as the client which made it impossible not to be woken repeatedly by the client when sleeping and impossible not to be interrupted by the client when eating.

126.    BOGAAN's client had dimentia and never continuously slept for more than 4 hours at any time.

127.    During the BOGAAN time period, BOGAAN had to turn the client every 2 hours

and therefore did not get 5 hours of uninterrupted sleep during her 24 hour shifts.  BOGAAN reported this turning by a code by phone at the end of each shift.

128.    During the 24 hour shifts, BOGAAN  was only given a couch to sleep on which did not have  any fold out bed and was very uncomfortable and did not allow me to get any sleep.

129.    During the BOGAAN time period, BOGAAN was not paid full regular wages for all her hours worked and was not paid overtime wages for all of her hours worked over forty in a workweek ("overtime"), and was not paid an extra hour of pay for her hours worked over a spread of 10 hours per day.

130.    During the BOGAAN time period, BOGAAN often worked for 24 hours staying overnight at the client's house, and on these days was only paid for 13 hours, despite the fact that her sleep was regularly interrupted generally at least 3-4 times by the client throughout the night which prevented her from getting 5 hours of uninterrupted sleep and/or 8 hours of sleep and despite the fact that BOGAAN was not given any time off for meal breaks.

131.    BOGAAN also generally signed in and out using the client's land line phone.

132.    When BOGAAN clocked out, BOGAAN generally entered codes showing the types of work that BOGAAN had performed.  At times BOGAAN filed handwritten time sheets. There were no codes to report not getting sleep or breaks during 24-hour shifts.

133.    During the BOGAAN time period, BOGAAN did not receive a meal break because BOGAAN was on call or working during her break and regularly interrupted by the client while eating.

134.    During the BOGAAN time period, BOGAAN was not paid for all her hours

worked and was not paid for her hours worked over 40 hours a week ("overtime hours") at time and one half my regular wages and at times was not paid for all my hours at the minimum wage rate.

135.    During the BOGAAN time period,  BOGAAN was not specifically notified by Defendants of the regular pay day designated by Defendants, Defendants' name, address and principle place of business and telephone number and my specific rate of pay as required by the New York Wage Theft Prevention Act.  BOGAAN has not been given any specific notice of this information to sign in Ukranian, her first language or in English or in any other language and has not signed any such notice.

LUBOV KONIK

136.    LUBOV KONIK ("LUBOV" was a home health aide/maid employed by Paramount Home Care Agency Inc. ("Paramount"), and Roman Offengeym, Owner and  CEO, and his mother Marina Offengeym (collectively "Defendants" or the "Company"), from about January 25, 2016 to January 19, 2018 (the "LUBOV time period"). During the time period LUBOV worked for one woman client with the initials L.V. who lived with her son.

137.    During the LUBOV time period, Roman Offengeym is and has been an owner and Chief Executive Officer of Paramount.

138.    During the LUBOV time period, Marina Offengeym is and has been an owner and President of Paramount.

139.    During the LUBOV time period, Roman Offengeym and Marina Offengeym each participated in the day-to-day operations of Paramount.

140.    During the LUBOV time period, Offengeym and Marina Offengeym each had

authority over the management, supervision, and oversight of the Paramount's affairs in general and exercised operational control over Paramount's home health aide employees and other employees and his decisions directly affected the nature and condition of the home health care employees' employment.

141.    During the LUBOV time period,  Offengeym and Marina Offengeym each had the power to hire and terminate me and the other home health aide employees of the Company ("home health aides") and did hire and terminate health aide employees, (2) supervised and controlled me and the other home health aides' schedules and conditions of employment, (3) determined the rate and method of payment of myself and the other home health aides, and (4) maintained employment records related to myself and the other home health aide employees.

142.    During the LUBOV time period, LUBOV never worked for Defendants outside of New York City.

143.    During the LUBOV time period, LUBOV  maintained my own residence, and did not "live in" the homes of Defendants' clients or in the home of her employer, as her primary residence.

144.    During the LUBOV time period, LUBOV was not an "exempt companion" of the Defendants' clients.

145.    While employed by Defendants, LUBOV generally worked more than 40 hours per week and was not paid time and one half for her hours worked over 40 in a work week.

146.    LUBOV worked 24-hour shifts for Defendants during her employment and regularly worked 7 24-hour shifts in a week.

147.    During the LUBOV time period, Defendants had no policies in place to determine

if a health aide received three one hour meal breaks during a 24-hour live in shift and did not have any policies to determine if any health aide received 5 hours of uninterrupted sleep and 8 hours of sleep during a 24-hour live in shift.

148.    During the LUBOV time period, even when Defendants had knowledge that a health aide was unable to get any sleep during the night or take any meal breaks, Defendants still illegally deducted 8 hours of sleep time and three hours of meal break time from the health aide's hours worked.

149.    During the LUBOV time period, Defendants had no policies in place to identify which health aides were not getting sleep or breaks during 24-hour live in shifts and to pay them for their lack of sleep or meal breaks.

150.    During the LUBOV time period, Defendants had no policy to identify which aides were not provided a bed to sleep on during 24-hour live in shifts.

151.    147.    During the LUBOV time period, even when Defendants knew an aide was not given a bed to sleep on during 24-hour live in shifts, Defendants did not pay the health aide for 8 hours of the aide's 24 hour shift.

152.    When LUBOV worked 24-hour shifts, LUBOV was required to stay overnight at the residences of Defendants' clients, and needed to be ready and available to provide assistance to Defendants' clients as needed.

153.    When LUBOV worked 24-hour shifts, I was not permitted to leave the client unattended.

154.    LUBOV was only paid for approximately 13 hours of her 24-hours shifts. LUBOV was not paid any hourly rate for the other 11 hours worked.

155.    LUBOV was generally not permitted to leave the client's residence during her shift.

156.    Because Defendants' clients were often elderly and/or suffering from dementia, LUBOV did not get an opportunity to sleep for eight hours or 5 hours without any interruption.

157.    LUBOV did not get a one-hour break for each of three meals per day.

158.    LUBOV was often forced to combine her meal times with the meal times of the Defendants' clients because they needed feeding assistance or constant supervision.

159.    LUBOV did not receive the "spread of hours" premium of one additional hour at the minimum wage rate for the days in which LUBOV worked a spread of more than ten hours.

160.    LUBOV also did not receive minimum wages, including minimum wages under the Wage Parity Act, for all her hours worked and was not paid time and one half the minimum wage rate for her overtime hours and was not paid full time and one half her regular rate for her overtime hours.

161.    Defendants never provided or offered to LUBOV any health insurance, free of charge, and never paid LUBOV for any vacation or holiday time off.

162.    Medicaid paid Defendants for some or all of  LUBOV's services and the services of the other similar home health aide employees.

163.    LUBOV's co-workers performed the same and/or similar work to that of LUBOV and were paid in a similar manner and subject to the same rules and policies ("similar health aides").

164.    The similar health aides did not "live in" the homes of Defendants' clients as their primary residences.

165.    The similar health aides generally worked more than 40 hours per week, but were not paid for every hour that they worked.

166.    The similar health aides were only paid for approximately 13 hours of their 24-hours shifts, and were not paid any hourly rate for the other 11 hours worked.

167.    The similar health aides were generally not permitted to leave the client's residence during their shift.

168.    When the similar health aides worked 24-hour shifts, they were required to stay overnight at the residences of Defendants' clients, and were required to be ready and available to provide assistance to Defendants' clients as needed.

169.    At all relevant times, Defendants have maintained a practice and policy of paying similar health aides for only 13 hours of their 24-hour shifts in violation of New York Labor Law.

170.    During the LUBOV time period, Defendants had no policies in place to determine if a health aide received three one hour meal breaks during a 24-hour live in shift and did not have any policies to determine if any health aide received 5 hours of uninterrupted sleep and 8 hours of sleep during a 24-hour live in shift.

171.    When LUBOV told the supervisor that LUBOV was unable to get any sleep during the night or any meal breaks, Defendants still deducted 8 hours of sleep time and three hours of meal breaks from my hours worked.

172.    Defendants had no policies in place to identify which health aides were not getting sleep or breaks during 24-hour live in shifts and to pay them for their lack of sleep or meal breaks.

173.    LUBOV and the similar health aides did not receive the "spread of hours" premium of one additional hour at the minimum wage rate for the days in which we worked a spread of more than ten hours.

174.    When LUBOV  first started to work 24-hour shifts, LUBOV complained to her coordinator and to payroll, that LUBOV was not able to sleep during the night or get meal breaks but was not being paid for 8 hours of alleged sleep and 3 hours of meal breaks.  They responded that the Company does not pay more than 13 hours for a 24-hour shift.

175.    LUBOV was not able to get 5 hours of uninterrupted sleep or 8 hours of sleep during 24 hour live in shifts because LUBOV generally had to get up at least every four hours to attend to the client, which included among other services, to take the client to the bathroom, to get the client a glass of water, to calm the client when the client awoke in stress, to clean the client's bed when the client urinated or defecated in the bed and/or to change the client's pajamas.

176.    LUBOV's clients had Alzheimers' Disease and never continuously slept for more than half an hour at any time.

177.    During the 24 hour shifts, LUBOV was only given a pull out bed from a couch which was broken and was very uncomfortable and did not allow me to get any sleep.

178.    During the time period, LUBOV  was not paid full regular wages for all my hours worked and was not paid overtime wages for all of her hours worked over forty in a workweek ("overtime"), and was not paid an extra hour of pay for my hours worked over a spread of 10 hours per day.

179.    During the time period, LUBOV often worked for 24 hours staying overnight at

the client's house, and on these days was only paid for 13 hours, despite the fact that her sleep was regularly interrupted generally at least 3-4 times by the client throughout the night which prevented her from getting 5 hours of uninterrupted sleep and/or 8 hours of sleep and despite the fact that I was not given any time off for meal breaks.

180.     LUBOV also generally signed in and out using the client's land line phone. When  LUBOV clocked out, LUBOV generally entered codes showing the types of work that LUBOV had performed.  At times I filed handwritten time sheets. There were no codes to report not getting sleep or breaks during 24-hour shifts.

181.     During the time period, I did not receive a meal break because I was on call or working during my break and regularly interrupted by the client while eating.

182.     During the time period, I was not paid for all my hours worked and was not paid for my hours worked over 40 hours a week ("overtime hours") at time and one half my regular wages and at times was not paid for all my hours at the minimum wage rate.

183.     During the time period, my job responsibilities as a home health aide/maid included, among others, cleaning the entire house, cooking and doing the laundry.

184.     I was required to prepare three meals a day, breakfast, lunch and dinner.

185.     Breakfast usually consisted of coffee, eggs, toast, and oatmeal.

186.     Lunch usually consisted of a cooked meal with rice or pasta, beans, and a meat or fish.  Sometimes alternatively I made a sandwich or mixed vegetables for lunch.

187.     Dinner usually consisted of the similar items as lunch plus soup and desert.

188.     I was required to prepare whatever foods the customer requested.

189.     I generally was required to make the beds every morning.

190.    Defendants required me to do a number of tasks on a daily basis, including but not limited to: dusting, vacuuming, cleaning the bathroom (including the toilet, tub and shower), mopping the kitchen floors, scrubbing the kitchen counters, cleaning the pots and pans, and taking out the garbage.

191.    I generally was required to do the laundry two days per week.

192.    I spent at least 30% of my time directly performing household work.

193.    During the LUBOV time period, LUBOV and similar health aide employees were not specifically notified by Defendants of the regular pay day designated by Defendants, Defendants' name, address and principle place of business and telephone number and specific rate of pay as required by the New York Wage Theft Prevention Act.

194.    LUBOV have not been given any specific notice of this information to sign in Ukranian, her first language or in English or in any other language and has not signed any such notice.

## CLAIM I
## <u>FAIR LABOR STANDARDS ACT</u>

195.    Plaintiffs repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

196.    At all relevant times, Defendants have been and continue to be, employers engaged in interstate commerce and/or the production of goods for commerce, within the meaning of the FLSA, 29 U.S.C. §§ 206(a) and 207(a).

197.    At all relevant times, Defendants employed, and/or continue to employ, Plaintiff and each of the Collective Action Members within the meaning of the FLSA.

198.    Upon information and belief, at all relevant times, Defendants have had gross

revenues in excess of $500,000.

199.  Plaintiffs consent in writing to be a party to this action, pursuant to 29 U.S.C. §216(b).  The Plaintiffs' written consents are attached hereto and incorporated by reference.

200.  At all relevant times, the Defendants had a policy and practice of refusing to pay its employees minimum wages and/or overtime wages equal to time and one half their employees' regular wages for hours worked over forty in a work week.

201.  As a result of the Defendants' willful failure to compensate its employees, including Plaintiff and the Collective Action members overtime wages and/or minimum wages for all of their hours worked the Defendants have violated and, continue to violate, the FLSA, 29 U.S.C. §§ 201 *et seq.*, including 29 U.S.C. §§ 207(a)(1) and 215(a).

202.  As a result of the Defendants' failure to record, report, credit and/or compensate its employees, including Plaintiffs and the Collective Action members, the Defendants have failed to make, keep and preserve records with respect to each of its employees sufficient to determine the wages, hours and other conditions and practices of employment in violation of the FLSA, 29 U.S.C. §§ 201, *et seq.*, including 29 U.S.C. §§ 211(c) and 215(a).

203.  The foregoing conduct, as alleged, constitutes a willful violation of the FLSA within the meaning of 29 U.S.C. § 255(a).

204.  Due to the Defendants' FLSA violations, Plaintiffs and the Collective Action Class are entitled to recover from the Defendants, their unpaid minimum and overtime wages, and an equal additional amount as liquidated damages, additional liquidated damages for unreasonably delayed payment of wages, interest, reasonable attorneys' fees, and costs and disbursements of this action, pursuant to 29 U.S.C. § 216(b).

## CLAIM II
## <u>NEW YORK LABOR LAW</u>

205.    Plaintiffs repeat and reallege each and every allegation of the preceding paragraphs hereof with the same force and effect as though fully set forth herein.

206.    At all relevant times, Plaintiffs and the members of the Class were employed by the Defendants within the meaning of the New York Labor Law, §§ 2 and 651.

207.    Defendants willfully violated Plaintiff's rights, and the rights of the members of the Class, by failing to pay them wages in violation of the New York Labor Law and its regulations.

208.    The Defendants' New York Labor Law violations have caused Plaintiffs and the members of the Class, irreparable harm for which there is no adequate remedy at law.

209.    Due to the Defendants' New York Labor Law violations, Plaintiffs and the members of the Class are entitled to recover from Defendants their unpaid wages, unpaid minimum wages, unpaid overtime wages, unpaid spread of hours wages, reasonable attorneys' fees, and/or costs and disbursements of the action, pursuant to New York Labor Law §663(1) et seq.

210.    Defendants willfully violated the rights of Plaintiffs and the Class by failing to provide them proper notices and wage statements in violation of the New York Wage Theft Prevention Act, N.Y. Lab. Law § 198(1-a) (enacted on April 9, 2011).

211.    As a result of Defendants' violation of the New York Wage Theft Prevention Act, Plaintiffs and the Class are each entitled to damages of at least $150 per week during which the violations occurred.

## CLAIM III
(Breach of Contract –Third Party Beneficiaries of Wage Parity Act Contract
With New York State)

212.     Plaintiffs repeat and reallege each and every allegation of the preceding

paragraphs hereof with the same force and effect as though fully set forth herein.

213.     Upon information and belief, at all times relevant to this complaint, Defendant

were required to certify and did certify that they paid Plaintiffs and members of the Class

wages as required by NY Health Care Worker Wage Parity Act.

214.     The agreement to pay Plaintiffs and the Class wages as required by the NY

Health Care Worker Wage Parity Act was made for the benefit of the Plaintiffs and the Class.

215.     Defendant breached their obligation to pay Plaintiffs and the Class all wages

they were due as required by the NY Health Care Worker Wage Parity Act and as result

Plaintiffs  and members of the Class were injured.

216.     Plaintiffs and the Class, as third party beneficiaries of Defendants' contract

with government agencies to pay wages as required by the NY Health Care Worker Wage

Parity Act, and as persons protected by the NY Health Care Worker Wage Parity Act are

entitled to relief for the breach of this contractual obligation and the violation of this Act,

plus interest.

## CLAIM IV
(Unjust Enrichment, Defendants' Failure to Pay All Wages Due Including Wages for Minimum
Wages under the NY Health Care Worker Wage Parity Act, and Spread of Hours)

217.     Plaintiffs reallege and incorporate by reference all preceding paragraphs of this

Complaint.

218.     Under the common law doctrine of "unjust enrichment" insofar as Defendants, by

their policies and actions, benefited from, and increased their profits and personal compensation by failing to pay Plaintiffs and the Class: (1) all wages due for work performed; (2) an extra hour at the minimum wage for working a "spread of hours" in excess of 10 hours or a shift longer than 10 hours; and (3) all minimum wages due under NY Pub. Health§ 3614-c, the New York Health Care Worker Wage Parity Act.

219.    Defendant accepted and received the benefits of the work performed by Plaintiffs and the Class at the expense of Plaintiffs and the Class.  It is inequitable and unjust for Defendants to reap the benefits of Plaintiff's and the Class' labor, without paying all wages due, which includes but is not limited to all minimum wages due under NY Pub. Health§ 3614-c, the New York Health Care Worker Wage Parity Act, for hours caring for the clients of Defendants.

220.    Plaintiffs and the Class are entitled to relief for this unjust enrichment in an amount equal to the benefits unjustly retained by Defendants, plus interest on these amounts.

**CLAIM V**
(Violation of Wage Parity Act Minimum Wage Requirement)

221.    Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint.

222.    Upon information and belief, at all times relevant to this complaint, Defendants were required to certify and did certify that they paid Plaintiffs and members of the Class wages as required by NY Health Care Worker Wage Parity Act.

223.    Under the NY Health Care Worker Wage Parity Act Defendants were required to pay Plaintiffs and the members of the Class minimum wages under the NY Health Care Worker Wage Parity Act.

224.    Defendants breached their obligations to pay minimum wages as required by the NY Health Care Worker Wage Parity Act, and as result Plaintiffsand members of the Class were injured.

225.    Plaintiffs and the Class are entitled to recover their unpaid minimum wages, plus interest, as relief for the violation of the NY Health Care Worker Wage Parity Act.

**CLAIM VI**
(Breach of Contract-Wages)

226.    Plaintiffs reallege and incorporate by reference all preceding paragraphs of this Complaint.

227.    Plaintiffs and the members of the class entered into contracts with the Defendant under which Plaintiffs and the members of the Class were to provide home health aide and maid services and Defendants were required to pay (a) wages as required by law, (b) wages equal to time and one half the regular wage rate for hours worked during Federal holidays and also (c) a one week paid vacation annually.

228.    Plaintiffs and the members of the Class fulfilled their obligations under the contracts but Defendant failed to pay the wages as required by the contracts.

229.    As a result of Defendants' breach, Plaintiffs and the members of the Class are entitled to recover damages, plus interest.

**CLAIM VII**
(Living Wage Act claim)

230.     Plaintiffs reallege and incorporate by reference all the allegations set forth above.

231.    NYC Admin. Code § 6-109 provides that an employer whose employees perform

work pursuant to city service contracts or subcontracts (the "City Service Contract(s)") must pay "no less than the living wage and must provide its employees health benefits (supplemental benefits) or must supplement their hourly wage rate by an amount no less than the health benefits supplement rate."

232.    NYC Admin. Code § 6-109 further provides that "[the abovementioned] requirement applies for each hour that the employee works performing the city service contract or subcontract."

233.    The "living wage" and "health benefits" or "health benefits supplement" are the wages and supplements set forth under Homecare Services in § 6-109 of the NYC Admin. Code. Upon information and belief, the schedule of living wages and supplements to be paid to all workers furnishing labor pursuant to the City Service Contract(s) was annexed to and formed a part of the City Service Contract(s), in accordance with NYC Admin. Code § 6-109.

234.    Plaintiffs and other members of the putative class furnished labor to Defendant in furtherance of its performance of the City Service Contract(s).  Upon information and belief, Defendant willfully paid Named Plaintiff and the other members of the putative class less than the rates of wages and benefits to which Named Plaintiff and the other members of the putative class were entitled.

235.    Defendant's actions as described herein were intentional and not made in good faith.

236.    Upon information and belief, the City Service Contract(s) entered into by Defendant contained provisions requiring the payment of living wages and health benefits or health benefit supplements to Plaintiffs.

36

237.   Those living wages and health benefits or health benefit supplements were made a part of the City Service Contract(s) for the benefit of Plaintiffs.

238.   Defendant breached the City Service Contract(s) by willfully failing to pay Plaintiffs the living wages and health benefits or health benefit supplements for all labor performed.

239.   Further, NYC Admin. Code § 6-109 specifically requires, as a matter of law, that language mandating compliance with NYC Admin. Code § 6-109 be included with and form a part 13 of the City Service Contract(s).

240.   Further, upon information and belief, each and every City Service Contract(s) contained a provision, in identical or similar language, stating that "each and every provision of law required to be inserted in this Agreement shall be and is inserted herein.  Furthermore, it is hereby stipulated that every such provision is to be deemed to be inserted herein."

241.   By reason of its breach of the City Service Contract(s), Defendant is liable to Plaintiffs for an amount to be determined at trial, plus interest.

## CLAIM VIII
### (Notice & Wage Statement Violations – NYLL §195)

20.   Plaintiffs reallege and incorporate by reference all allegations in all preceding paragraphs as if they were set forth again herein.

21.   Defendant has willfully failed to supply Plaintiffs and members of the Class with the notice required by NYLL § 195(1), in English or the language identified by Plaintiffs or the Class Member as his/her  primary language.

22.   Defendant has failed to provide Plaintiffs and Members of the Class with a notice containing their  "rate or rates of pay and the basis thereof, whether paid by the hour, shift, day,

week, salary, piece, commission, or other; hourly rate or rates of pay and overtime rate or rates of pay if applicable; allowances, if any, claimed as part of the minimum wage, including tip, meal, or lodging allowances; the regular pay day designated by the employer in accordance with [NYLL §191]; the name of the employer; any 'doing business as' names used by the employer; the physical address of the employer's main office or principal place of business, and a mailing address if different; the telephone number of the employer; plus such other information as the commissioner deems material and necessary."

23.     Defendant has willfully failed to supply Plaintiffs and Member of the Class with an accurate statement of wages as required by NYLL § 195(3), containing the "dates of work covered by that payment of wages; name of employee; name of employer; address and phone number of employer; rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; gross wages; hourly rate or rates of pay and overtime rate or rates of pay if applicable; the number of hours worked, including overtime hours worked if applicable; deductions; allowances, if any, claimed as part of the minimum wage; and net wages."

24.     Due to Defendant's violations of the NYLL§ 195(1), each Plaintiffs and Class Member is entitled to $50 dollars for each workday in which the violations occurred or continue to occur, or a total of $5,000, as provided for by NYLL § 198(1)-b, as well as reasonable attorneys' fees, costs, injunctive and declaratory relief.

25.     Due to Defendant's violations of the NYLL § 195(3), each Plaintiffs and Class Member is entitled to recover from Defendant $250 for each workday on or after April 9, 2011, on which the violations occurred or continue to occur, or a total of $5,000, as provided for by

NYLL § 198(1)-d.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs on behalf of themselves and all other similarly situated Collective Action Members and members of the Class, respectfully requests that this Court grant the following relief:

a. Certification of this action as a class action pursuant to Fed. R. Civ. P. 23(b)(2) and (3) on behalf of the members of the Class and appointing Plaintiffs and their counsel to represent the Class;

b. Designation of this action as a collective action on behalf of the Collective Action Members and prompt issuance of notice pursuant to 29 U.S.C. §216(b) to all similarly situated members of an FLSA Opt-In Class, apprising them of the pendency of this action, permitting them to assert timely FLSA claims in this action by filing individual Consents to Sue pursuant to 29 U.S.C. §216(b) and appointing Plaintiffs and their counsel to represent the Collective Action members;

c. Judgment in an amount to be determined at trial, plus interest;

d. A declaratory judgment that the practices complained of herein are unlawful under the FLSA and the New York Labor Law;

e. An order tolling the statute of limitations;

f. An injunction against the Defendants and their officers, agents, successors, employees, representatives and any and all persons acting in concert with it, as provided by law, from engaging in each of the unlawful practices, policies and

patterns set forth herein;

g. An award of unpaid wages, spread of hours wages, overtime wages and minimum wages due under the FLSA, the New York Labor Law, the New York common law, and/or the NY Health Care Worker Wage Parity Act;

h. An award of liquidated and/or punitive damages and/or statutory damages, as a result of the Defendants' willful failure to pay wages, minimum wages, and/or overtime wages pursuant to 29 U.S.C. § 216 and the New York Labor Law and the New York common law and the NY Health Care Worker Wage Parity Act and failure to provide notices required by the Wage Theft Prevention Act;

i. An award of prejudgment and postjudgment interest;

j. An award of costs and expenses of this action together with reasonable attorney's and expert fees;

k. Such other and further relief as this Court deems just and proper.

## **DEMAND FOR TRIAL BY JURY**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial by jury on all questions of fact raised by the complaint.


Dated:  New York, New York
        June 26, 2021


                        LAW OFFICE OF WILLIAM COUDERT RAND

                        _____

William Coudert Rand, Esq.
*Attorney for Plaintiff*, Individually and on
Behalf of All Persons Similarly Situated
501 Fifth Avenue 15th Floor
New York, New York 10017
Tel: (212) 286-1425
Fax: (646) 688-3078
Email: wcrand@wcrand.com

**CONSENT TO BECOME PARTY PLAINTIFF**

By my signature below, I hereby authorize the filing and prosecution of claims in my name and on my behalf to contest the failure of **Paramount Home Care Agency Inc., and Roman Offengeym, Owner and  CEO and mother Marina Offengeym  ET AL.** to pay me overtime wages and/or minimum wages as required under state and/or federal law and also authorize the filing of this consent in the action(s) challenging such conduct. I authorize the representative plaintiffs and designate them class representatives as my agents to make decisions on my behalf concerning the litigation, the method and manner of conducting this litigation, the entering of an agreement with Plaintiffs' counsel concerning attorneys' fees and costs, and all other matters pertaining to this lawsuit.

s/GALYNA ZINKO              4/19/2021       GALYNA ZINKO
_____      _____
Signature                          Date    Print Name

42

**CONSENT TO BECOME PARTY PLAINTIFF**


By my signature below, I hereby authorize the filing and prosecution of claims in my name and on my behalf to contest the failure of **Paramount Home Care Agency Inc., and Roman Offengeym, Owner and  CEO and mother Marina Offengeym  ET AL.** to pay me overtime wages and/or minimum wages as required under state and/or federal law and also authorize the filing of this consent in the action(s) challenging such conduct. I authorize the representative plaintiffs and designate them class representatives as my agents to make decisions on my behalf concerning the litigation, the method and manner of conducting this litigation, the entering of an agreement with Plaintiffs' counsel concerning attorneys' fees and costs, and all other matters pertaining to this lawsuit.


s/BOGAAN ZINKO          4/19/2021          BOGAAN ZINKO
_____     _____
Signature                          Date     Print Name

**CONSENT TO BECOME PARTY PLAINTIFF**

By my signature below, I hereby authorize the filing and prosecution of claims in my name and on my behalf to contest the failure of **Paramount Home Care Agency Inc., and Roman Offengeym, Owner and  CEO and mother Marina Offengeym  ET AL.** to pay me overtime wages and/or minimum wages as required under state and/or federal law and also authorize the filing of this consent in the action(s) challenging such conduct. I authorize the representative plaintiffs and designate them class representatives as my agents to make decisions on my behalf concerning the litigation, the method and manner of conducting this litigation, the entering of an agreement with Plaintiffs' counsel concerning attorneys' fees and costs, and all other matters pertaining to this lawsuit.


s/LUBOV KONIK                         3/10/2020      LUBOV KONIK
_____   _____
Signature                            Date    Print Name

44